In re CALSTAR, INC., Debtor.

Timothy D. MORATZKA,
Trustee, Plaintiff,

v.

VISA U.S.A. and Direct Marketing
Guaranty Trust, Defendants.

Bankruptcy No. 4–92–1206.
Adv. No. 4–93–19.

United States Bankruptcy Court,
D. Minnesota.

Sept. 30, 1993.

---

Thomas J. Lallier, Bradley J. Halberstadt, Mackall, Crounse & Moore, Minneapolis, MN, for plaintiff.

Steven L. Freeman, Gurstel & Gurstel, Minneapolis, MN, William C. Penkethman, Jr., Kamberg & Berman, P.C., Springfield, MA, for defendants.

## ORDER AVOIDING TRANSFERS

ROBERT J. KRESSEL, Chief Judge.

This adversary proceeding came on for hearing on June 8, 1993, on the parties' cross-motions for summary judgment. Thomas J. Lallier and Bradley J. Halberstadt appeared for the plaintiff and William C. Penkethman, Jr. and Steven L. Freeman appeared for the defendant.[1] This court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 201. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

## UNDISPUTED FACTS

The debtor is a mail order merchant receiving orders by phone and payment by credit card. On January 25, 1989, the debtor and defendant, a credit card processor,[2] entered into a "Credit Card Processing Service Agreement." According to the agreement, each day the debtor electronically notifies the defendant of the amount and number of credit card sales. The defendant then electronically deposited the "net proceeds"[3] of credit card sales into the debtor's bank account. That is, every day the defendant deposits in the debtor's bank account total credit card sales less customer refunds,[4] "processing fees"[5] and

---

1. The plaintiff, by separate motion, moved to amend his complaint to exclude Visa U.S.A. as a defendant. I granted the motion. Thus, when I refer to "defendant," I am referring to DMGT only.

2. Credit card transactions usually involve three parties: The merchant; the credit card processor; and the card issuing institution. The merchant writes the sale and sends the amount electronically to the credit card processor. The credit card processor, in turn, electronically sends the net proceeds to the merchant's bank account and also sends a message to the card issuing bank notifying it of the sale. The card issuing bank, in turn, sends a bill. For a thorough discussion of credit card transactions and the parties involved *see generally,* Stephen L. Sepinuck, *Classifying Credit Card Receivables Under the U.C.C.: Playing with Instruments?,* 32 Ariz.L.Rev. 789, 797–99 (1990).

3. Specifically, the agreement defines "net proceeds" as "the net debit or credit amount that we cause to be transferred to your Bank Account. It is:
   1. The Bank Card Draft Net Amount
   2. Less the Bank Card Credit Net Amount
   3. Less the Bank Card Chargeback Net Amount
   4. Less the Processing Fees."

4. The agreement defines customer refunds as "credits ... submitted by [the debtor] to [the defendant] to offset specific Sales Drafts previously presented by [the debtor]."

5. "Processing fees are the fees [the defendant] charge[s] [the debtor] for ... services as speci-

"chargebacks." [6]

On February 14, 1992, the debtor filed a chapter 11 case. The plaintiff was appointed trustee on March 27, 1992.

Notwithstanding the debtor's pending case, on March 5, 1992, the defendant agreed with the debtor to continue processing the debtor's credit card transactions as long as it could establish a post-petition reserve account.[7] The reserve account[8] was established and between March 5, 1992 and June 8, 1992, the debtor electronically submitted post-petition charges of $103,-430.99 to the defendant. During approximately the same post-petition period, the defendant reduced the debtor's deposits by $59,679.96[9] as chargebacks against pre-petition charges. The plaintiff requested that the defendant return the amounts charged back as unauthorized post-petition transfers. The defendant refused. The plaintiff commenced this adversary proceeding seeking to avoid the post-petition transfers pursuant to 11 U.S.C. § 549(a)

and recover them pursuant to 11 U.S.C. § 550(a). Additionally, the plaintiff has asked me to either sanction the defendant pursuant to section 362(h) or hold the defendant in contempt for violating the automatic stay.

## ISSUES

I. Are chargebacks, made post-petition against pre-petition charges, avoidable under section 549(a) or violative of the automatic stay?

II. Can a corporation be held in contempt or sanctioned pursuant to 362(h) or otherwise for violating the automatic stay?

## DISCUSSION

### I.

### The Standards For Summary Judgment [10]

Summary judgment plays a very important role allowing the judge to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

---

fied in Schedule A as may be amended from time to time."

**6.** A "chargeback is a charge against a Sales Draft [the debtor] previously presented." According to Paragraph 16 of the agreement, the defendant could "chargeback" against the plaintiff if any of these events took place:

1. Return or non-delivery of goods or services;
2. Where authorization was required and not obtained;
3. Where the Card Sale date is after the Credit Card's expiration date;
4. Where [the merchant] ... received notice that the Credit Card is not to be honored;
5. Where the Sales Draft is executed or accepted fraudulently;
6. If we do not receive your response to a Retrieval Request within the three (3) Business Day period;
7. Where the purchaser disputes sale of goods or services, or execution of Sales Draft or claims that the sale price is subject to any set-off, defense or counterclaim;
8. Where a Cardholder refuses to make payment for a Sales Draft because in the Cardholder's good faith opinion, a claim or complaint has not been resolved, or has been resolved by you but in an unsatisfactory manner;
9. Where the sale or extension of credit is in violation of any law;

10. Where you have breached any of the terms or conditions of this Agreement including, but not limited to, a breach of any warranty or representation, specified in Section 9;
11. Where the Credit Card was not presented, the Cardholder denies making the purchase, and the merchandise was sent to an address other than that of the Cardholder."

**7.** A "reserve account is a bank account that [the defendant] may set up for the benefit of [the debtor's] customers. [The debtor's] claim to the funds in this account will be subordinated first to the claims of your customer's [sic] (i.e., Credits and Chargebacks) and then to our Processing Fees." As of July 10, 1992, the date the agreement was terminated, $14,617.56 remained in the reserve account.

**8.** The defendant deposited 15% of the debtor's post-petition charge card sales into the reserve account.

**9.** This is the amount shown in the plaintiff's affidavits. The defendant did not supply any credible evidence indicating that the amount is different.

**10.** *See generally,* William W. Schwarzer, Allan Hirsch, David J. Barrans, *The Analysis and Decision of Summary Judgment Motions; A Monograph on Rule 56 of the Federal Rules of Civil Procedure,* 139 F.R.D. 441 (1992); George Loewenstien, *Second Thoughts about Summary Judgment,* 100 Yale L.J. 73 (1990); Louis, *Federal Summary Judgment Doctrine: A Critical Analy-*

trial." Advisory Committee Notes to Rule 56. The importance of summary judgment cannot be overemphasized. Indeed, "[s]ummary judgment ... is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). "The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Co–Op., Inc.*, 838 F.2d 268, 273 (8th Cir.1988); *see Catrett v. Johns–Manville Sales Corp.*, 756 F.2d 181, 189–90 (D.C.Cir. 1985) (Bork, J. Dissenting).[11]

Under Rule 56(c)[12] of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

## A. The Burdens

### 1. The Moving Party

■ Initially, the burden is on the party seeking summary judgment. It is the mov-ing party's job to inform the court of the basis for the motion, and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Simply stated, the moving party must show the court that there is an absence of evidence to substantiate the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554. To that end, the movant discharges its burden by asserting that the record does not contain a triable issue and identifying that part of the record which supports the moving party's assertion. *See Id.* at 323, 106 S.Ct. at 2553; *City of Mt. Pleasant*, 838 F.2d at 273.

### 2. The Non-moving Party

■ Once the movant has made its showing, the burden of production shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] ... own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'" establish that there is specific and genuine issues of material fact warranting a trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The non-moving party cannot cast some metaphysical doubt on the moving party's assertion. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must present specific significant probative evidence supporting its case, *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990) sufficient enough "to require a ... judge to resolve the parties' differing versions of the truth at trial." *Anderson*

---

*sis,* 83 Yale L.J. 745 (1974); Currie, *Thoughts on Directed Verdicts and Summary Judgment,* 45 U.Chi.L.Rev. 72 (1977).

**11.** Judge Bork's comments were later adopted by the United States Supreme Court. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**12.** Rule 56 of the Federal Rules of Civil Procedure is applicable to this proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Any affidavits must "be made on *personal* knowledge, must set forth such facts as would be *admissible in evidence*, and shall affirmatively show that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e) (emphasis added). If, however, the evidence tendered is "merely colorable," or is "not significantly probative," the non-moving party has not carried its burden and the court must grant summary judgment to the moving party. *Id.* 477 U.S. at 249–50, 106 S.Ct. at 2511. Here, no material facts are in dispute. Accordingly, judgment may be entered as a matter of law.

## II.

### *Post–Petition Chargebacks as Avoidable Transfers*

■ The plaintiff asserts that pursuant to 11 U.S.C. § 549(a) the chargebacks are avoidable post-petition transfers of property. According to section 549(a),

the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and ...

(2) (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). Thus, to avoid the transfer, the trustee must prove:

1. That property of the estate was transferred;

2. after the filing of a petition;

3. which was not authorized by the Code or by the court.

*See* 11 U.S.C. § 549(a). The defendant does not dispute the existence of the second and third elements. Thus, these motions boil down to one question: Was property of the estate transferred?

### A. *Was Property of the Estate Transferred?*

The plaintiff argues that there was a transfer of property of the estate. I agree. The defendant, charging back pre-petition charges against post-petition credit card sales, transferred property of the debtor's estate.

### 1. *Are Post–Petition Credit Card Sales Property of the Estate?*

■ The plaintiff argues that the post-petition credit card sales are property of the estate. I agree. Section 541 states that a debtor's estate includes:

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

(7) Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. §§ 541(a)(6) & (7). Clearly, the post-petition credit card sales are property of the debtor's estate. That is, the debtor's post-petition sales of pre-petition inventory, are both an "interest in property that the estate acquire[d] after the commencement of the case" as well as "proceeds, product ... or profit of or from property of the estate...:" 11 U.S.C. §§ 541(a)(6) & (7). While the analysis is rather wooden, the result is clear: The post-petition credit card sales were property of the estate. *See also United States v. Challenge Air International, Inc.* (*In re Challenge Air International, Inc.*), 123 B.R. 661, 663–64 (S.D.Fla. 1991), *aff'd*, 952 F.2d 384 (11th Cir.1992). (Funds held in a charge back reserve account, pursuant to airline credit card service agreement with debtor, were property of estate).

### 2. *Was the Money Paid by the Defendant to the Debtor Pre–Petition the Debtor's Property or Something Else?*

The defendant, on the other hand, would have me believe that property of the estate was not transferred. Creatively, the defendant argues that it did not touch property

of the estate since it was reversing amounts provisionally credited to the debtor's account.[13] While the defendant's argument is enterprising it is not persuasive.

The defendant supports it's theory by citation to *Equitable Bank of Littleton, N.A. v. Jobin (In re Twenty–Four Hour Nautilus Swim and Fitness Center, Inc.)*, 81 B.R. 71 (D.Colo.1987). According to *Twenty–Four Hour Nautilus*, credit card sales credited to a debtor pre-petition are not property of the debtor's estate until the dispute period has run.[14] The *Twenty–Four Hour Nautilus*[15] court relies, as the does the defendant, on section 4–212 of the Uniform Commercial Code. However, *Twenty–Four Hour Nautilus* is no longer good law.[16] Section 4–212 of the Uniform Commercial Code has been repealed and its replacement, section 4–214, on its face, does not apply to credit card transactions.[17]

### a. Does Article 4 of the Uniform Commercial Code Apply to Credit Card Transactions?

Interpreting any codification of the law, I look to the plain meaning of the words as they were drafted. *C.f. Connecticut Nat'l. Bank v. Germain*, — U.S. —, —, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391; *Patterson v. Shumate*, — U.S. —, ——— , 112 S.Ct. 2242, 2248–51, 119 L.Ed.2d

519 (1992); *U.S. v. Nordic Village, Inc.*, — U.S. —, —, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas*, — U.S. —, —, 112 S.Ct. 527, 530, 116 L.Ed.2d 514 (1991); *Board of Governors v. MCorp Financial, Inc.*, — U.S. —, —, 112 S.Ct. 459, 465–66, 116 L.Ed.2d 358 (1991).

Turning to the U.C.C., section 4–214 provides:

> If a *collecting bank* has made provisional settlement with its customer for an *item* and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement of the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not its able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.... These rights to revoke, charge back, and obtain refund terminate if an when a settlement for the item received by the bank is or becomes final.

U.C.C. § 4–214 (1992) (emphasis added).[18] Parsing the statute, I discover that section 4–214 applies to *"collecting banks* [who

13. Essentially, the defendant is saying that amounts transferred to the debtor were some how temporary. However, there was nothing temporary about the funds. Indeed, even the defendant conceded that it had no right to go into the debtor's bank account and repossess the funds or for that matter have any control over the funds. The debtor had sole possession of all funds and the exclusive right to use them.

14. The rules and regulations of the card organizations provide the card issuing banks with a time frame within which the bank may generate a chargeback after the bank received a cardholder dispute. Generally, the dispute period is 120 days.

15. *Nautilus* was decided prior to the 1990 amendments to Article 4.

16. Even if *Twenty–Four Hour Nautilus* was still good law, the decision is neither controlling nor correctly decided. The specific clarifying amendments to Article 4 make it clear that

credit card slips are and were to be excluded from the definition of "items."

17. Paragraph 24 of the agreement provides that New Hampshire law governs. That does not change the analysis. The New Hampshire Legislature recently approved and enacted revised section 4–104(a)(9). *See* N.H.Stat. 382–A:4–104(a)(9) (enacted and approved July 1, 1993; effective Jan. 1, 1994). While the amendment is not yet in effect, it is clear from both unofficial comments as well as the nation-wide sweeping acceptance the amendments have won, section 4–104(a)(9) was merely a clarification of and not a change in the law.

18. Comment 1 to section 4–214 provides:

> Under current bank practice, in a major portion of cases banks make provisional settlement for items when they are first received and then await subsequent determination of whether the *item* will be finally paid, this is the principal characteristic of what are referred to in banking parlance as *"cash items."* Statistically, this practice of settling provision-

make] provisional settlement with its customer for an *item....*" U.C.C. § 4–214. A "collecting bank" is a bank "handling an *item* for collection except the payor bank." *Id.* at § 4–105(5). What this really suggests, is that section 4–214 only applies to those who handle items. However, the defendant did not handle "items." In fact, this conclusion is glaring:

> "Item means an instrument or a promise or order to pay money handled by a bank for collection or payment. The term *does not include* a payment order governed by Article 4A or *a credit or debit card slip.*" [19]

U.C.C. § 4–104(a)(9) [20] (amending U.C.C. § 4–104(1)(g)) (emphasis added).

Curiously, prior to the 1990 amendments, courts erroneously concluded that credit card slips were "items." *See, e.g., In re Standard Financial Management Corp.*, 94 B.R. 231, 234–35 (Bankr.D.Mass.1988); *Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.)*, 84 B.R. 79, 81–82 (Bankr.W.D.Tex.1987), *aff'd.*, 99 B.R. 333 (N.D.Tex.1989), *aff'd.*, 893 F.2d 720 (5th Cir.1990); *Twenty–Four*

*Nautilus Swim and Fitness Center, Inc.*, 81 B.R. at 73; *First United Bank v. Philmont Corp.*, 533 So.2d 449 (Miss.1988); *see also Broadway Nat'l Bank v. Progressive Casualty Ins. Co.*, 775 F.Supp. 123, 128 (S.D.N.Y.1991) (interpreting New York state law); *aff'd.*, 963 F.2d 1522 (2d Cir. 1992) (unpublished opinion); *Broadway Nat'l Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 187–88, 585 N.Y.S.2d 933, 938 (N.Y.Sup.Ct.1992) (interpreting New York state law). That is, prior to the 1990 amendment, an "item" was defined as: "any instrument for the payment of money even though it is not negotiable but does not include money." U.C.C. § 4–104(1)(g) (repealed 1990). However, in 1990, the drafters expressly clarified the definition of item.[21] Now it is without doubt: "[Item] *does not include ... a credit or debit card slip.*" U.C.C. § 4–104(a)(9) (emphasis added). Section 4–214 does not apply.

## B. *Conclusion*

■ The trustee has met his burden. When the defendant made pre-petition payments to the debtor those payment became

---

ally first and then awaiting final payment is justified because the vast majority of such cash items are finally paid, with the result that in this great preponderance of cases it becomes unnecessary for the banks making the provisional settlements to make any further entries. In due course the provisional settlements become final simply with the lapse of time. However, in those cases in which the item being collected is not finally paid or if for various reasons the bank making the provisional settlement does not itself receive final payment, provision is made in subsection (a) for the reversal of the provisional credits and the right to obtain refund. U.C.C. § 4–214 comment 1 (1992) (emphasis added).

19. While portions of the transaction are by wire, this should not distract from underlying form of the exchange; an exchange having its origins in a debit or credit slip.

20. Section 4–104(a)(9) of the New Hampshire 1993 Session Laws provides:

> "ITEM" means an instrument or a promise or order to pay money handled by a bank for collection or payment. The term *does not include* a payment order governed by Article 4A, if Article 4A is adopted by this state or a *credit or debit card slip.*

*See* N.H.Stat. 382–A:4–104(a)(9) (enacted and approved July 1, 1993; effective Jan. 1, 1994) (emphasis added).

21. One commentator clearly believes that the drafters specifically excluded credit card transactions because article 4 was being "odd[ly] appli[ed]." Robert G. Ballen, Thomas C. Baxter, Jr., William B. Davenport, Incent D. Rougeau, and Stephen C. Veltri, *Commercial Paper, Bank Deposits and Collections, and Other Payment Systems*, 45 Bus.Law. 2341, 2371 (1990). Discussing *First United Bank v. Philmont Corp.*, 533 So.2d 449 (Miss.1988), the authors had these disparaging remarks:

> While no member of the committee [on bank deposits] found [the court's] result objectionable, the court's opinion that article 4 applied because the credit card slips were "items" attracted unfavorable comment.... [I]t is inconceivable that the drafters of the Code or the Mississippi legislature believed article 4 would apply to credit card transactions. These transactions are regulated by federal law and application of article 4 could conflict with aspects of the federal regulation. (footnote omitted).

*Id.* I agree. Section 4–214 was passed as a clarifying amendment. Thus, even under 4–212, decisions opining that credit card slips are "items" cannot be correct.

the absolute property of the debtor. The defendant retained a contingent pre-petition claim against the debtor for any appropriate chargebacks.

When the defendant use post-petition payments in the escrow account and reduced daily deposits to the debtor to satisfy its pre-petition claim it was effecting a post-petition transfer of property of the estate which was not authorized by the court or the Bankruptcy Code. The plaintiff may therefore recover the amount of the transfers from the defendant. *See* 11 U.S.C. § 549(a); 11 U.S.C. § 550(a)(1); *In re B & L Oil Co.*, 782 F.2d 155, 158 (10th Cir.1986) (once bankruptcy petition is filed, debts that arose before the petition may not be satisfied through post-petition transactions); *In re Garland Coal & Mining Co.*, 67 B.R. 514, 519 (Bankr.W.D.Ark.1986) (payments made to creditors after petition was filed are subject to being set aside as unauthorized payment of pre-petition unsecured debts).[22]

## III.

### *Post–Petition Chargebacks as Violations of the Automatic Stay*

Next, the plaintiff argues that the defendant violated the automatic stay. Again, I agree with the plaintiff. The defendant, charging back pre-petition charges against post-petition credit card sales, violated the automatic stay.

### A. *Did the Defendant Violate the Automatic Stay?*

The automatic stay is a statutory creation. As with all statutes, analysis focus-

es on words of Congress. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) ("the fundamental canon [of] statutory interpretation begins with the language of the statute itself."); *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). "[My] sole function ... is to enforce [the statute] according to its terms." *Id.* at 241, 109 S.Ct. at 1030 (citing *Caminetti v. U.S.*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Defining the terms of the statute, I must "presume that a legislature says in a statute what it means and means in a statute what it says ..." *Connecticut Nat'l. Bank v. Germain*, —— U.S. at ——, 112 S.Ct. at 1149 giving effect to the statute's plain meaning. *See, e.g., Patterson v. Shumate*, —— U.S. ——, ——, 112 S.Ct. 2242, 2248–51, 119 L.Ed.2d 519 (1992); *Germain*, —— U.S. ——, 112 S.Ct. at 1149–50; *U.S. v. Nordic Village, Inc.*, —— U.S. ——, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas*, —— U.S. ——, ——, 112 S.Ct. 527, 530, 116 L.Ed.2d 514 (1991); *Board of Governors v. MCorp Financial, Inc.*, —— U.S. ——, ——, 112 S.Ct. 459, 465–66, 116 L.Ed.2d 358 (1991).[23]

### 1. *Did the Defendant Obtain Possession of Property or Exercise Control Over Property of the Estate Violating the Automatic Stay?*

■ The plaintiff asserts that the defendant violated section 362(a)(3). I agree.

---

**22.** *See* discussion at section III.2.a. *infra.*

**23.** The "plain language" doctrine is widely accepted and applied by a majority of the current Supreme Court. *See, e.g., Patterson v. Shumate,* —— U.S. ——, ——, 112 S.Ct. 2242, 2248–51; 119 L.Ed.2d 519 (1992); *Connecticut Nat'l Bank v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149–50, 117 L.Ed.2d 391 (1992); *U.S. v. Nordic Village, Inc.,* —— U.S. ——, ——, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas,* —— U.S. ——, ——, 112 S.Ct. 527, 530, 116 L.Ed.2d 514 (1991); *Board of Governors v. Mcorp Financial, Inc.,* —— U.S. ——, ——, 112 S.Ct. 459, 465–66, 116 L.Ed.2d 358 (1991). Although the "plain meaning" doctrine is not always followed,

[it is] regrettable that we have a legal culture in which [legislative history and policy] arguments have to be addressed ... with respect to a statute utterly devoid of [ambiguity].

*Union Bank,* —— U.S. at ——, 112 S.Ct. at 534 (Scalia, J., concurring).

... [T]he phenomenon [of looking outside the "plain meaning" of words in the statute] calls into question whether our legal culture has so far departed from attention to text, or is so lacking in agreed-upon methodology for creating and interpreting text, that it any longer makes sense to talk of "a government of laws, not of men."

*Patterson,* —— U.S. at ——, 112 S.Ct. at 2250–51 (Scalia, J., concurring).

The defendant, by charging back pre-petition charges against post-petition credit card sales, did violate section 362(a)(3).

Specifically, section 362(a)(3) provides that the filing of a case under title 11 stays

any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a)(3). As I previously concluded, the post-petition credit card sales were property of the debtor's estate. Logically then, the defendant, by charging back, and thus reducing the gross amount of the post-petition credit card sales, performed an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). A clear violation of the automatic stay.

### 2. Did the Defendant Collect or Recover a Claim Against the Debtor That Arose Before the Commencement of the Case Violating the Automatic Stay?

■ Next, the plaintiff argues that the defendant violated section 362(a)(6). I agree. The defendant's chargeback of prepetition charges against post-petition sales is an act to collect a claim which arose prepetition.

Section 362(a)(6) provides that the filing of a case under title 11, stays

any act to collect, assess, or recover a claim against the debtor that arose before the commencement of a case under this title.

11 U.S.C. § 362(a)(6). Which simply means, a creditor violates the automatic stay if it:

1. Acts to collect, assess, or recover;

2. A "claim."

*Id.*

### a. Does the Defendant Have a "Claim?"

The defendant maintains it did not violate section 362(a)(6) asserting that charge backs are not "rights to payment" but rather a reversals of provisional credits.[24] However, the defendant is wrong.

Specifically, "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured....

11 U.S.C. § 101(5)(A). Here, the defendant, upon crediting the debtor for credit card sales, obtained a contingent claim dependent on later events to become noncontingent.

Really what is going on here is a series of classic setoffs[25] that contractually arise out of the agreement between the debtor and the defendant. That is, according to the agreement, every day the defendant transfers money into the debtor's bank account. Along with that transfer, the debtor authorized the defendant to offset future deposits to the debtor's account against chargebacks.[26] The defendant did not have any other remedy. The defendant could not go into the debtor's bank account or pursue any other action to repossess the funds actually transferred. Nor, for that matter, could the defendant control those funds in any way. All the defendant had was a contractual[27] right to payment which through "chargebacks" it could offset against future credits to the debtor. Which, simply means, every time the defendant credited the debtor's account, it ob-

---

**24.** *See* analysis *supra* concluding that section 4–214 of the Uniform Commercial Code does not apply.

**25.** Such setoffs are also prohibited. *See* 11 U.S.C. § 362(a)(7).

**26.** A "chargeback is a charge against the Sales Draft you previously presented."

**27.** Interestingly, the remedies available under Article 4, such as the right to chargeback under

section 4–214, evolved from common law contract and warranty principles. Specifically, Article 4 is the codified right of restitution. *See generally,* Steven B. Dow and Nan S. Ellis, *The Payor Bank's Right to Recover Mistaken Payments: Survival of Common Law Restitution Under Proposed Revisions to Uniform Commercial Code Articles 3 and 4,* 65 Ind.L.Rev. 779 (1990).

tained a *contingent, unmatured* right to payment; a "claim." *See Id.; Sherman v. First City Bank of Dallas (In re United Sciences of America, Inc.)*, 893 F.2d 720, 724 (5th Cir.1990) (upon crediting a merchant's account, the right to chargeback gives rise to a "claim").

Having a claim, the defendant violated the automatic stay if it pursued "any act to collect, assess, or recover [its] claim against the debtor that arose before the commencement of a case under this title." 11 U.S.C. § 362(a)(6). Clearly, the defendant violated the automatic stay. In fact, it is undisputed that the defendant, reducing post-petition deposits, was attempting to recover claims that arose pre-petition. *Cf. In re United Sciences of America, Inc.*, 84 B.R. at 82 (dicta) ("To allow parties who dealt with a debtor-in-possession, pre-petition, to continue subjectively crediting or off-setting these credit card settlements post-petition would defeat the definition of property of the estate and the policy of the automatic stay."). The violation could not be clearer.

### B. Can a Creditor be Held in Contempt for Violations of the Automatic Stay?

■ The plaintiff urges me to hold the defendant in contempt for violating the automatic stay. However, there is no legal basis to hold the defendant in contempt.

Upon filing of either a voluntary or involuntary case under Title 11 of the United States Code, virtually all actions against the debtor or the debtor's property are by statute automatically stayed. *See* 11 U.S.C. § 362. While the "automatic stay is one of the fundamental debtor protection

provided by the bankruptcy laws ... giv[ing] the debtor a breathing spell from his [sic] creditors ... [statutorily] stop[ping] all collection efforts, all harassment, and all foreclosure actions...." S.Rep. No. 989, 95th Cong., 2d Sess. 54–55, *reprinted in*, 1978 U.S.Code Cong. & Admin.News 5787, 5840–41 creditors often violate it. However, since the automatic stay is statutory rather than a court order, a creditor cannot be held in contempt for these violations.

Historically, a debtor's stay protection arose by court order. Indeed, before any provision for an automatic stay in bankruptcy existed, the debtor or trustee could prevent creditor action only by a court order. *See, e.g., Clark v. Larremore*, 188 U.S. 486, 23 S.Ct. 363, 47 L.Ed. 555 (1903). Recognizing that this procedure failed to provide a debtor with needed protection, both the 1938 amendments to the Bankruptcy Act of 1898 and later the Bankruptcy Rules provided for a stay. In the first instance, however, the stay, specifically required a court order and in the second, it was, in effect, an order of the Supreme Court. *See* Chandler Act, ch. 575, § 113, 52 Stat. 840, 884 (temporary stay upon cause shown) (repealed 1978); *Id.* at § 148, 52 Stat. 840, 888 (stay arises when order approving petition is issued) (repealed 1978); *Id.* at § 428, 52 Stat. 840, 918 (stay arising only after notice and hearing) (repealed 1978); Bankr.R. 11–44, 11 U.S.C.App.R. 11–44 (repealed 1983).[28]

Today, however, the automatic stay is a creation of Congress and not the bankruptcy court or even the Supreme Court. *See* 11 U.S.C. § 362(a). As a statutory provi-

---

**28.** The old Rules of Bankruptcy Procedure were promulgated by the Supreme Court pursuant to 28 U.S.C. § 2075 (1982). Among the rules incorporating automatic stays were: Bankr.R. 401, 11 U.S.C.App.R. 401 (1982); Bankr.R. 601, 11 U.S.C.App.R. 601 (1982); Bankr.R. 8–501, 11 U.S.C.App.R. 8–501 (1982); Bankr.R. 10–601, 11 U.S.C.App.R. 10–601 (1982); Bankr.R. 13–401, 11 U.S.C.App.R. 13–401 (1982); and Bankr.R. 11–44, 11 U.S.C.App.R. 11–44 (1982). Rule 11–44, which was the Rule applicable to chapter XI cases, provided:

A petition ... shall operate as a stay of the commencement of the continuation of any

court or other proceeding against the debtor, or the enforcement of any judgement against him, or of any act or the commencement or continuation of any court proceeding to enforce any lien against his property, or of any court proceeding, except a case pending under Chapter X of the Act, for the purpose of rehabilitation of the debtor or the liquidation of his estate.

Bankr.R. 1–44, 11 U.S.C.App.R. 11–44 (1982). This Rule was superseded by new Bankruptcy Rules promulgated by the Supreme Court in 1983 and perhaps by the enactment of the Bankruptcy Code itself.

sion, contempt is no longer the appropriate remedy for violations of the automatic stay. *See generally,* Dan B. Dobbs, *Contempt of Court: A Survey,* 56 Cornell L.Rev. 183, 185–221 (1971) (no basis for holding a party or lawyer in contempt for just violating an act of Congress); J. Steven Feldman, Note, *Contempt and the Automatic Stay of the 1978 Bankruptcy Code: Are They Compatible?,* 6 Cardozo L.Rev. 177, 193–97 (1984); Jeffrey A. Stoops, *Monetary Awards to the Debtor for Violations of the Automatic Stay,* 11 Fla.St.U.L.Rev. 423, 435–39 (1983); *see also* 18 U.S.C. § 401 (contempt sanction available to punish a violator of a "writ, process, order, rule, decree or command" but not a legislative provision).

Unfortunately, courts have consistently ignored the distinction; the automatic stay is a legislative provision, not a court order. Illustrative is *In re Eisenberg,* 7 B.R. 683 (Bankr.E.D.N.Y.1980). *Eisenberg* opines that contempt is an appropriate remedy for violations of the automatic stay. *Id.* at 691–2. However, *Eisenberg* is simply wrong.

Principally, the *Eisenberg* court relies on *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976). The *Fidelity Mortgage* court held that a violator of Rule 11–44 of the Federal Rules of Bankruptcy Procedure could be held in contempt. *Id.* at 53. However, the *Fidelity Mortgage* decision is probably wrong.

The *Fidelity Mortgage* court opines:

Rule 11–44 specifically provides that a Chapter XI proceeding "shall operate as a stay of the commencement" of any proceeding against the debtor or with respect to the debtor's property. Since Rule 11–44 has the effect of an order and was designed to expedite automatically the stay that would otherwise be obtained by an order, it would be exalting form over substance to hold that a violation of Rule 11–44 is not punishable under § 41(a) and Rule 920 because techni-

cally the rule-based stay is not labeled an "order...."

*Id.* at 52–3. This proposition is puzzling. The *Fidelity Mortgage* court creatively engineers a doctrine which simply ignores that the Rules of Procedure and the United States Code are *not* court orders. Either something is a court order or it is not. Effect or not, neither the Rules of Procedure nor the United States Code are court orders.[29]

Congress had the specific opportunity to codify the results of the *Fidelity Mortgage* decision, but decided not to. *See* Technical Amendments Bill, S. 658, 96th Cong., 2d Sess, § 225 (1980), *reprinted in* H.R.Rep. No. 1195, 96th Cong., 2d Sess. 157 (1980). (Congress was proposing to amend 28 U.S.C. § 1481 to include: "(b) A contempt punishment by a bankruptcy court includes any act that is in violation of a stay under title 11."). If Congress felt that contempt sanctions were appropriate or, for that matter, that the automatic stay had the *effect* of a court order, it could have enacted the proposed amendment. However, the provision was *not* enacted. Absent such a specific provision or a court order, there are no grounds to hold a violator of the automatic stay in contempt of court. *C.f. Finney v. Arkansas Bd. of Correction,* 505 F.2d 194, 213 (8th Cir.1974) (actual knowledge of court order required for contempt); *In re Associated Hobby Mfrs.,* 33 B.R. 959, 962 (Bankr.E.D.Pa.1983) ("we must find that there was a specific and definite order of the court ... violated" before holding someone in contempt); *In re DePoy,* 29 B.R. 471, 475 (Bankr.N.D.Ind. 1983) (in order to hold a party in contempt, they must have notice or knowledge of a court order).

## C. Can a Corporation be Sanctioned for Violating the Automatic Stay?

### 1. Under § 362(h)?

■ The plaintiff asserts that pursuant to section 362(h) I can sanction the defen-

---

**29.** The result could perhaps be defended on the theory that as promulgations of the Supreme Court rules are the equivalent of court orders. However, the Supreme Court has promulgated a lot of rules. *See, e.g.,* Federal Rules of Civil Procedure, Federal Rules of Criminal Procedure, Federal Rules of Bankruptcy Procedure, Federal Rules of Appellate Procedure and the Federal Rules of Evidence. It is doubtful that the Supreme Court felt that violations of all of these rules were punishable by contempt.

dant. I disagree. Section 362(h) protects only human debtors and not corporations.

Section 362(h) provides that I may sanction:

An *individual* injured by any willful violation of a stay provided by the section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h) (emphasis added). While the statute is clear on its face, the definition of "individual" is not. Indeed, "individual" not being defined in the Code, has led to confusion and a significant split over whether section 362(h) should be applied to corporations. However, an analysis of the plain language of the Code and legislative history yields a rather obvious result; section 362(h) does not apply to corporations. *Johnston Envtl. Corp. v. Knight (In re Goodman )*, 991 F.2d 613, 619 (9th Cir.1993); *Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 920 F.2d 183, 186 (2d Cir.1990); *In re Abacus Broadcasting Corp.*, 150 B.R. 925, 928 (Bankr.W.D.Tex. 1993); *In re MCEG Productions, Inc.*, 133 B.R. 232, 236 (Bankr.C.D.Cal.1991); *In re Prairie Truck Ry.*, 125 B.R. 217, 220 (Bankr.N.D.Ill.1991); *FirstRepublic Bank Corp. v. NCNB Texas Nat'l. Bank (In re First Republic Bank Corp.)*, 113 B.R. 277, 279 (Bankr.N.D.Tex.1989); *In re Brilliant Glass, Inc.*, 99 B.R. 16, 18 (Bankr.C.D.Cal. 1988). *But see Cuffee v. Atlantic Business and Community Dev. Corp. (In re Atlantic Business and Community Dev. Corp.)*, 901 F.2d 325, 329 (3rd Cir.1990) (section 362(h) applies to corporations); *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292 (4th Cir. 1986) (same); *In re Omni Graphics, Inc.*, 119 B.R. 641, 644 (Bankr.E.D.Wis.1990) (same); *In re Mallard Pond Partners*, 113 B.R. 420, 423 (Bankr.W.D.Tenn.1990); *In re Schewe*, 94 B.R. 938, 948 (Bankr. W.D.Mich.1989); *In re Tel–A–Communications Consultants, Inc.*, 50 B.R. 250, 254 (Bankr.D.Conn.1985).

The Code does not define "individual," but does define "person." "Persons" include "individuals, partnerships and corporations." 11 U.S.C. § 101(41). If corporations were "individuals," there would be no need to specifically include them in the definition of "persons."

This distinction was intentional as it appears in other parts of the Code. Take for instance section 109(e) where Congress specifically provides that Chapter 13 is available only to an "individual with regular income ... or an individual with regular income and such individual's spouse...." 11 U.S.C. § 109(e). Corporations do not have spouses. Nor can corporations be relatives under the Code. A "relative" is defined as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." 11 U.S.C. § 101(45). Obviously, Congress was talking about humans when it used "individual" in its definition of "relative."

Further evidence that Congress used "individual" to mean a natural person and not a "corporation" is found in the sections discussing insiders. Congress deliberately defined "insider" twice. Once when the debtor is an "individual" and another when the debtor is a "corporation." *See* 11 U.S.C. § 101(30)(A) & (B). Such unequivocal specificity is evidence of Congress' express desire that a corporations is not an individual.

When Congress speaks as clearly as it has done here, the plain meaning of the legislation is conclusive, except in those "rare cases" in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters. *Ron Pair Enters., Inc.*, 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). However, excluding corporations from the entities that are sanctionable under section 362(h) does not contravene the intent of the drafters of the Code. Indeed, such an interpretation does not conflict with any other section of the Code, the legislative history of section 362 or, for

that matter, with any important state or federal interest.

Subsection (h) was enacted in a group of amendments specifically addressing human debtors. That is, subsection (h) was part of the "Consumer Credit Amendments." *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat, 333, 352, *reprinted in,* U.S.Code Cong. & Admin.News 576, 577 (1984) (BAFJA). These expansive amendments were a response to the cries of the consumer credit lobby which vociferously alleged that individual debtors were abusing the bankruptcy process. *See In re White,* 49 B.R. 869, 872 (Bankr.W.D.N.C.1985) ("The consumer credit amendments ... were the offspring of Congressional concern that creditor costs were being driven upwards by the ready availability of discharge via Chapter 7 to persons seeking to sidestep consumer credit obligations who had the ability to pay.")[30] *see generally,* Karen Gross, *Preserving a Fresh Start for the Individual Debtor: The Case for Narrow Construction of the Consumer Credit Amendments,* 135 U.Pa.L.Rev. 59, 61–62, 82–85 (1986). While Congress adopted many of the suggestions made by the lobby, it did so with a jaundiced eye; Congress was concerned about abuse on both sides of the consumer transaction. Attempting to even the balance, Congress expressly enacted subsection (h) as a supplement to the remedies otherwise available to human debtors. *See* 130 Cong.Rec. H1942 (daily ed. Mar. 26, 1984) (remarks of Rep. Rodino) (Section 362(h) was enacted as "an additional right of individual debtors and [was] not intended to foreclose recovery under already existing remedies."); *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1104 (2d Cir.1990) (section 362(h) is an independent statutory basis apart from other remedies for violations of the automatic stay). Clearly, it was Congress' intent that section 362(h) apply to individual in their human capacity only. Any other conclu-

sion flies in the face of what Congress expressly sought to accomplish.

Therefore, I conclude that section 362(h) is not a source of power to sanction the defendant for violating the automatic stay.[31]

### 2. *Does the Court have the Inherent Right to Punish Creditors or Other Entities that Violate the Automatic Stay?*

Section 105(a) is a clear delegation of authority from Congress to punish creditors or other entities that violate the automatic stay. Specifically, section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title....

11 U.S.C. § 105(a).

Beyond what the statute provides, the Eighth Circuit has recently said as much. Specifically, in *Ragar v. Ramsay (In re Ragar),* 3 F.3d 1174 (8th Cir.1993) the Eighth Circuit, deciding that a bankruptcy court can hold a entity in criminal contempt, stated:

> If a bankruptcy court can decide the qualification of attorneys to represent parties before it, which no one denies, and if such decisions are necessary or appropriate in the execution of the court's duties under Title 11, which again no one denies, it is likewise necessary or appropriate for the court to enforce its own orders. True, such enforcement vindicates the authority of the court, but the authority of courts exists not for its own sake, *but for the sake of the duties that Congress has entrusted to them....*

While *Ragar* dealt with contempt as a sanction for violating court orders, the underlying message is broader. Section 105 exists as a source of power for Bankruptcy Judges to enforce the Bankruptcy Code.

---

**30.** Only human debtors receive a discharge in chapter 7. Corporations do not. *See* 11 U.S.C.

**31.** I realize that the plaintiff is an individual. However, I think the proper focus is on the debtor which is a corporation.

Otherwise, section 362 could become the proverbial right without a remedy.

Section 105(a) gives me the power to punish the defendant for violating the automatic stay. While corporations cannot be sanctioned under section 362(h), section 362(h) merely supplemented rights that existed at the time of its passage. *See* 130 Cong.Rec. H1942 (daily ed. Mar. 26, 1984) (remarks of Rep. Rodino) (Section 362(h) was enacted as "an additional right of individual debtors and [was] not intended to foreclose recovery under already existing remedies."); *In re Crysen/Montenay Energy Co.*, 902 F.2d at 1104 (section 362(h) is an independent statutory basis apart from other remedies for violations of the automatic stay).

### 3. *What is the Appropriate Remedy for the Defendant's Violation of the Automatic Stay?*

■ Clearly, the trustee is entitled, at a minimum, to recover damages equal to the amount of chargebacks that were made in violation of the automatic stay. The plaintiff did not sufficiently prove consequential damages nor was the defendant's conduct so egregious or outrageous as to justify punitive damages. After all the chargebacks were made pursuant to a post-petition agreement with the debtor in possession. The violations were done out of the ignorance not malice. I am awarding the trustee damages in the amount of $59,679.96.[32]

### IV.

#### *Does DMGT Have a Right of Setoff?*

■ The defendant argues that, even if the chargebacks are recoverable under section 550 or section 362, I should not order them returned. The defendant claims that once the funds are back in the escrow account or in the plaintiff's hands it would be entitled to offset those funds again, subject, or course, to obtaining relief from

the automatic stay. This argument misses the mark.

Section 553 provides that title 11

does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

11 U.S.C. § 553(a).

However, as I previously stated, the defendant upon crediting the debtor's account obtained a "claim"—a right to payment which arose pre-petition. The defendant is seeking to offset its pre-petition claim against post-petition credit card sales. On its face, section 553 does not allow this. The defendant does not have a right to setoff. *Cf. Norton v. Associated Grocers of Maine, Inc. (In re Peabody)*, 51 B.R. 157, 159 (Bankr.D.Me.1985) (the right to setoff may be exercised only if it exists).[33]

### V.

#### *Conclusion*

The defendant's chargebacks constituted unauthorized post-petition transfers avoidable by the trustee under section 549(a) and recoverable from the defendant under section 550(a). Those same chargebacks violated the automatic stay providing the trustee with an alternative basis for recovering the chargebacks.

**THEREFORE, IT IS ORDERED:**

1. The plaintiff's motion for summary judgment is granted in part;

2. The defendant's motion for summary judgment is granted in part;

3. The plaintiff shall recover from the defendant the sum of $59,679.96 together with costs of $120.00 and interest as provided by law.

---

**32.** These damages are the same amount recoverable as unauthorized post-petition transfers, not in addition.

**33.** *See also* section III *supra* concluding that section 4–214 of the U.C.C. does not give the defendant any state law rights.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**