In re Stephen SOLL, Debtor.

In re Gloria SOLL, Debtor.

LITTLE PAT, INC.; Robert J. Davis as Trustee for the estates of Stephen Soll and Gloria Soll, and Esther Ambrose, Plaintiffs,

v.

Edward N. CONTER, Richard J. Bailey, III, Charles Kinsley and June Kinsley, Richard Coghan, McBride & Associates and Christopher McBride, Defendants.

Bankruptcy Nos. 92–02355–PHX–SSC, 92–02356–PHX–SSC.
Adv. No. 93–768.

United States Bankruptcy Court, D. Arizona.

Feb. 22, 1995.

Lawrence D. Hirsch, Hirsch Law Office, P.C., Phoenix, AZ, for Little Pat, Inc.

Edwin P. Lee, Law Office of Edwin P. Lee, Phoenix, AZ, for Robert Davis, Trustee.

Thomas Karvel, Crosby & Gladner, Phoenix, AZ, for Edward Conter.

John Friedman, John Friedman, P.C., Phoenix, AZ, for Richard Coghan.

Edmund Nomura, Edmund Nomura, P.C., Phoenix, AZ, for debtors.

## MEMORANDUM DECISION

SARAH SHARER CURLEY, Bankruptcy Judge.

### PROCEDURAL HISTORY

This matter comes before this Court on an *"Application for Sanctions Against Edward Conter"* filed on November 30, 1992 by **LITTLE PAT, INC.** (hereinafter "Little Pat"). On November 30, 1992, **ROBERT J. DAVIS**, the Chapter 7 Trustee (hereinafter "the Trustee") filed an *"Application for Sanctions Against Edward Conter"* which included a joinder in Little Pat's Application. Little Pat and the Trustee subsequently filed numerous pleadings seeking sanctions not only against **EDWARD CONTER** (hereinafter "Conter"), but other individuals (hereinafter "Defendants"). The Trustee and Little Pat entered into settlement agreements with all of the Defendants except for Conter. The remaining parties briefed their respective positions, and the issues were narrowed for trial.

This Court conducted evidentiary hearings on December 7, 1993; December 8, 1993; December 9, 1993; April 4, 1994; April 5, 1994; May 24, 1994; May 25, 1994; and May 26, 1994. At the conclusion of the hearing on May 26, this Court deemed this matter under advisement. ·

1. See Memorandum Decision filed on July 1, 1994 in Adversary Number 92–994, *Little Pat, Inc. v. Winnon Shepherd; Esther Ambrose; and Gilbert Rosales,* Docket Number 55 (hereinafter "the 92–994 Memorandum Decision").

2. See the 92–994 Memorandum Decision.

3. See the 92–994 Memorandum Decision.

4. See Plaintiff's Exhibit Nos. 11 and 12. Plaintiff's Exhibit No. 11 is the purchase agreement between Shepherd and Ambrose. Paragraph 5 reflects that the first payment on the amount owed to Shepherd was scheduled to be made on

This constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* (hereinafter "RBP"). This is a "core" proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### FACTUAL BACKGROUND AND TESTIMONY

#### A. Purchase of the Bar by Little Pat, Inc.

Little Pat purchased the bar known as **CHEERS III** (hereinafter "the Bar") from **WINNON SHEPHERD** (hereinafter "Shepherd") on or about June 1, 1990. When Little Pat purchased the Bar from Shepherd, it executed three promissory notes in favor of Shepherd. One note was paid in full. Little Pat granted a purchase money security interest in the Bar as security for the repayment of the remaining two promissory notes (hereinafter "Shepherd Promissory Notes").[1] Little Pat executed chattel security agreements and UCC–1 financing statements, which were recorded with the Arizona Secretary of State's Office.[2]

On or about October 16, 1991, Little Pat sold the Bar to **GLORIA** and **STEVEN SOLL** (hereinafter "the Solls"). The Solls granted Little Pat a "second lien" on the assets of the Bar as security for the repayment of the indebtedness due and owing to Little Pat.[3]

#### B. Sale of the Shepherd Promissory Notes.

On July 23, 1992, Shepherd, through his attorney-in-fact, **ANGELO AROCHO**, sold his interest in the Shepherd Promissory Notes to **ESTHER AMBROSE**.[4]

August 8, 1992. This Court further notes that under ¶ 6, Shepherd retained a security interest in the assets of the Bar as a result of the chattel security agreement and UCC–1 financing statement previously executed by Little Pat in favor of Shepherd. Also see the 92–994 Memorandum Decision.

However, at the time Ms. Ambrose purchased the Notes, she was still a debtor in possession in a Chapter 11 proceeding, Case No. 91–03731–PHX–GBN. Her case was not dismissed until October 14, 1992.

In the documentation concerning the sale of the Shepherd Promissory Notes, Shepherd noted that he had not received payments from Little Pat, his obligor, and that the Shepherd Promissory Notes were in default. Since Little Pat had sold the Bar to the Solls and the Solls had not paid Little Pat on the "wrap indebtedness", Little Pat was unable to pay Shepherd. Therefore, if Shepherd sold an interest in the Shepherd Promissory Notes, he would at least receive an immediate infusion of cash from some third party.

Angelo Arocho learned through the accountant of Ms. Ambrose, that she was willing to purchase such an interest.[5] However, almost immediately after Ms. Ambrose purchased the Shepherd Promissory Notes, Conter became involved in various actions taken against Little Pat.

Conter was initially retained to represent Ambrose. Conter testified that at the time of the sale of the Shepherd Promissory Notes, he was contacted by Richard Coghan who said that he might have some future bankruptcy work for Conter. Coghan knew that although Conter had previously been associated with a firm which was composed of attorneys that practiced in the bankruptcy area, Conter knew nothing about bankruptcy. Therefore, this unsolicited call by Coghan offering Conter future business in an area for which Conter had no expertise should have been a warning sign to Conter. Now Conter was being summoned by Coghan's office mate, Kinsley, to discuss representation of Ambrose, a woman Conter had never met.

At the inception of the representation of Ambrose, around July 20, 1992, Conter met with Charles Kinsley, an accountant and Ambrose's attorney-in-fact, at Kinsley's "office." Ambrose had allegedly given Kinsley sufficient authority to retain an attorney for her.

Conter realized that Richard Coghan and Kinsley shared an office, which was essentially a large room. Conter could not have a confidential conversation with Kinsley. Conter also knew at the inception of the representation of Ambrose that she needed an attorney to collect monies due and owing on the Shepherd Promissory Notes, that the Shepherd Promissory Notes were secured by the assets of the Bar, that the Solls owned the Bar and they had filed bankruptcy petitions, that Coghan was the accountant for the Solls and preparing the financial statements or reports that were required in a bankruptcy proceeding, and that Coghan claimed a conflict of interest concerning any representation of the Solls and Ambrose. Given these circumstances, Conter should have thoroughly investigated the relationship of Ambrose, Kinsley, Coghan, and the Solls *before* he agreed to represent Ambrose. Conter should have thoroughly investigated the relationship between Coghan and Kinsley and whether Kinsley was indeed acting on his own. Conter's investigation was superficial. Conter even went so far as to accept cash from Kinsley for services to be rendered without really questioning where Kinsley had obtained the money.

Having done little or no investigation and having not explored the relationships or conflicts amongst the various players, Conter was quickly in over his head.

Conter sent a demand letter on July 30, 1992 to Little Pat, yet the Power of Attorney permitting Kinsley to retain an attorney for Ambrose had a date of August 5, 1992.[6] In

---

5. The parties presented conflicting evidence as to whether Charles Kinsley or Richard Coghan ultimately persuaded Ms. Ambrose to purchase an interest in the Shepherd Promissory Notes.

6. See Plaintiff's Exhibit No. 17. The Power of Attorney was solely for the purpose of collecting the Shepherd Promissory Notes. The Power of Attorney executed by Ambrose specifically stated:

My attorney in fact shall have all lawful authority to act in my place for the purpose of: to retain counsel for the purpose of collecting and taking related actions to collect the notes due & payable to me from Little Pat, Inc. Said actions include filing of suit and retention of subordinate professionals required to carry the case forward.

THIRD: My attorney in fact has full power and authority to perform any and every act and thing whatsoever requisite or necessary to be done in the exercise of any of the foregoing powers, to all intents and purposes as I might or could do if personally present with full power of substitution and revocation, hereby ratifying and confirming all that my attorney in fact may lawfully do or cause to be done by virtue of this Specific Power of Attorney.

The Power of Attorney had an effective date of August 5, 1992 and terminated on August 5, 1993. This document was signed by Ambrose

the demand letter, Conter informed Little Pat that the remaining two Shepherd Promissory Notes were being accelerated and demanded immediate payment in full.[7] In this letter, Conter indicated that Ambrose, his client, intended to exercise her rights in her security interest and to liquidate the necessary assets in order to satisfy the claim.[8]

Meanwhile on August 6, 1992, Ambrose transferred her interest in the Shepherd Promissory Notes to her son, Gilbert Rosales.[9] Conter did not investigate this transfer or determine whether he had a conflict of interest. Conter simply learned from Kinsley that Rosales was supposedly the real party-in-interest, since Rosales had allegedly provided the funds to Shepherd, and that Conter was to represent Rosales on the collection of the Shepherd Promissory Notes. If Conter had done just a preliminary investigation of his client Ambrose, he would have realized that at the time of her purchase of the interest in the Shepherd Promissory Notes, she still had her own bankruptcy petition pending, and she had received no court approval to incur the indebtedness necessary to purchase the Shepherd Promissory Notes.[10] Also since Conter was unclear as to the source of his retainer, unclear whose money had been utilized to purchase the interest in the Shepherd Promissory Notes, and unclear why the Shepherd Promissory Notes were so quickly transferred from Ambrose to Rosales, Conter should have been wary of representing either Ambrose or Rosales, yet Conter continued to represent both of them.[11]

**C. Cash Collateral Proceedings.**

Around July 15, 1992, Little Pat filed Notices of Non–Consent to the Use of Cash

Collateral in the bankruptcy proceedings of the Solls. On July 23, 1992, a bankruptcy judge issued an order in the Stephen Soll bankruptcy proceedings sequestering cash collateral and setting a hearing for July 24, 1992. At the July 24, 1992 hearing, a bankruptcy judge ordered that Stephen Soll be allowed to use the cash collateral for a four-day period for the limited purpose of purchasing food and beverages for the Bar. The bankruptcy judge conditioned the use of cash collateral upon the delivery of invoices and checks relating to the purchases to Little Pat's counsel. The bankruptcy judge did not authorize any other use of the cash collateral. Gloria Soll was present at this hearing and agreed to be bound by this order.

On July 28, 1992, the bankruptcy judge held a second cash collateral hearing.[12] Gloria Soll was again present. At this hearing, Stephen Soll and Gloria Soll entered into an agreement with Little Pat regarding the use of cash collateral and a potential dismissal of the Solls' bankruptcy proceedings. This agreement included a provision that on or before August 4, 1992, the Debtors would cure the arrearages of Shepherd, the first lienholder, or provide proof that the first lienholder had been paid in full.

Around August 5, 1992, Little Pat lodged orders in the Solls' bankruptcy proceedings directing the immediate sequestration of cash collateral and providing for an accounting to be submitted to Little Pat. Identical orders were subsequently entered on August 10, 1992 and August 11, 1992 in the bankruptcy proceedings of Stephen Soll and Gloria Soll, respectively.[13] The orders prohibited the Solls from using the cash collateral of the

but was not dated. The Notary portion of the document reflected a date of August 3, 1992.

7. See Plaintiff's Exhibit No. 14.

8. See *supra*, note 7.

9. See Plaintiff's Exhibit No. 13.

10. See Plaintiff's Exhibit Nos. 11 and 12. Pursuant to the Purchase Agreement, Ms. Ambrose was to pay Shepherd the sum of $15,000 cash, with the balance of $35,049.79 to be paid over three (3) years in monthly installments of $1,000. See Plaintiff's Exhibit No. 11, ¶ 5.

11. See note 6, *supra*. Kinsley also obtained a power of attorney from Rosales with almost the same dates on it as the Ambrose Power of Attorney. See Plaintiff's Exhibit No. 18. Kinsley utilized the Rosales Power of Attorney to retain Conter.

12. This Court notes that by this time Shepherd had sold the Shepherd Promissory Notes to Ambrose.

13. See Plaintiff's Exhibit No. 20.

Bar and directed that all cash collateral of Little Pat be sequestered.

Conter was aware of the cash collateral proceedings.[14] The Court so concludes, because Conter's August 4, 1992 time entry, which was subsequently included in an invoice forwarded to Kinsley, states:

Call to Mr. Hirsch

receive letter (my demand)

Cash collateral agreement that Solls are to bring 1st current

Chapter 11 if we don't renegotiate

"let me know after you talk to your client"

He'll get order from Judge Burns [sic].

However, at the trial in this matter, Conter testified that he felt any order entered by the Bankruptcy Court only pertained to the Solls. He, therefore, testified that his clients, Ambrose and Rosales, could utilize the cash generated by the Bar without any constraints. Conter did not investigate thoroughly the problems or responsibilities concerning the use of cash collateral which was part of a bankruptcy estate.

**D. The Takeover of the Bar.**

Conter wrote to counsel for Little Pat and to the Solls on August 17, 1992 to acknowledge that his client had taken over operations of the Bar and that Bar would be operated by Kinsley and Coghan.[15] In the letter, Conter indicates that Ms. Soll and her son surrendered the Bar to Rosales.[16] Again, Conter did not investigate to determine what was planned or to happen. Conter simply accepted Kinsley's vague statements. In the August 17, 1992 letter to Little Pat's counsel, Conter stated that Kinsley and Coghan would operate the Bar for Rosales, yet he knew that Coghan represented the Solls and had a conflict of interest concerning the operation of the Bar as to Rosales. Conter never contacted Rosales to determine if he wished to go beyond mere collection of the Shepherd Promissory Notes and actually operate the Bar and undertake all of the attendant liability that resulted therefrom. Conter also seemed to understand that taking over the Bar might require Bankruptcy Court approval,[17] but he did not thoroughly investigate this matter either.

At the time of trial, Conter's testimony concerning the takeover of the Bar was not consistent with his testimony at his deposition. For instance, at trial Conter believed he had the authority, pursuant to the Powers of Attorney from Kinsley on behalf of, first, Ambrose and then Rosales, to take over operation of the Bar. At his deposition, however, Conter noted at one point that his powers were limited to collecting the full amount due under the Shepherd Promissory Notes or accepting a surrender of the pledged collateral after proper steps were taken, such as a *Uniform Commercial Code* sale.[18]

Conter also conceded at trial that at the time of the takeover of the Bar, he was aware that the Solls, the owners and operators of the Bar, were involved in bankruptcy proceedings. Conter conceded that he was not a bankruptcy attorney and that he relied on brief conversations with two bankruptcy attorneys and with the Solls' attorney that Conter could take over the Bar for his client without Bankruptcy Court approval.

To support his position that the Solls voluntarily surrendered the Bar to Rosales, Conter testified that there were three occasions which he relied on. The first was a brief encounter with Gloria Soll at the office of Coghan and Kinsley.[19] However, Kinsley contradicted this testimony and stated that he did not recall Ms. Soll ever being at his office when Conter was there.[20] The second instance was that Coghan informed Conter

14. See Plaintiff's Exhibit No. 16.

15. See Plaintiff's Exhibit No. 15.

16. See *supra,* note 15.

17. See *supra,* note 15.

18. See Plaintiff's Exhibit No. 1, Deposition of Edward Conter III, dated November 19, 1992

(hereinafter "Deposition"), p. 70, lines 1–12; p. 79, lines 12–21; p. 171, line 20 through p. 122, line 2.

19. See Deposition, p. 120, line 20 through p. 121, line 7.

20. See trial transcript dated April 4, 1994, Docket Entry No. 135, p. 6, lines 7–11 (hereinafter "April 4 Transcript").

that the Solls had decided to abandon the Bar.[21] However, Conter was not getting a satisfactory explanation from Coghan, so Conter decided that he needed to check with Bailey, the Solls' attorney. Yet the third occasion upon which Conter relied, the meeting with Bailey, when Conter tried to approach Bailey at Bailey's office and discuss the issue, Bailey spent little time with Conter. Conter conceded that Bailey's explanation of what was going on was terse and "not too damn satisfactory."

Despite all of these warning signs, despite the fact that Conter was not a bankruptcy attorney and had little or no time to get proper counsel or do adequate research, Conter nevertheless proceeded with the takeover of the Bar in the name of his then client Rosales.

Around August 18, 1992, one day following the takeover of the Bar, Conter was provided by facsimile a copy of at least one cash collateral order.[22] Conter did not tell Kinsley, the agent of Rosales, or Rosales to sequester the cash collateral of the Bar. Rather Conter informed Kinsley that the Bar could spend the cash received by the Bar, so long as accounting records were maintained. Conter believed there was no other option other than operating the Bar and spending the cash collateral.[23] Conter, however, did not contact a bankruptcy attorney or take other appropriate action to ascertain what constraints such an order restricting the use of cash collateral had on his client.

On August 19, 1992, Little Pat filed a motion seeking protective custody of the Bar and seeking damages for the improper takeover of bankruptcy estate property. Conter responded on behalf of Rosales; and at the hearing on August 28, 1992, this Court ordered the appointment of a trustee and directed the United States Trustee to appoint a Chapter 11 trustee to operate the Bar. The United States Trustee appointed Robert Davis around August 30, 1992, which appointment was approved by this Court.

### E. The Consequences Of Conter's Failure To Represent His Client And To Investigate The Matter Properly.

Conter's failure to determine who his client was, his failure to provide competent legal advice to that client, his failure to request the assistance of bankruptcy counsel in an area in which Conter had no expertise, and his failure to investigate adequately the facts before he set in motion the chain of events resulting in the takeover of the Bar had horrific consequences.

As a result of the Powers of Attorney, Kinsley represented Ambrose and Rosales as attorney-in-fact. Kinsley used this authority to retain Conter for both individuals. If Conter had used the requisite care and had thoroughly investigated the facts and the law, he would have learned that Ambrose had only purchased a participation in the Shepherd Promissory Notes by paying the sum of $15,000 as a down payment, with the balance of $35,049.79 to be paid over a period of time.[24] As a result, Shepherd was a critical party to any action to be taken to foreclose the first position security interest in the Bar. Conter never considered the interests of, or consulted with, Shepherd. Conter's actions resulted in Kinsley and Coghan seizing control of the Bar and skimming all cash or revenues from the Bar for approximately two weeks to the detriment of Shepherd and Little Pat, the lienholders.

He would have learned that Ambrose had no authority to incur debt as a part of the consideration to purchase her interest in the Shepherd Promissory Notes, since her own bankruptcy proceeding was pending at the time of the acquisition. This would have made the acquisition subject to being set aside by the Bankruptcy Court. He would have learned that Ambrose, not Rosales, had

---

21. See Deposition, p. 121, lines 8–19. Conter further indicated that he inquired of Coghan if the abandonment "was cleared" with Bailey, Solls' bankruptcy counsel, and that Conter was told that Bailey did not approve of it but knew about it. See Deposition, p. 122, lines 10–18.

22. See Deposition, p. 137, lines 1–3.

23. See Deposition, p. 140, line 16 through p. 142, line 1.

24. See 92–994 Memorandum Decision and Plaintiff's Exhibit Nos. 11 and 12.

provided the sole consideration for the purchase of the interest in the Shepherd Promissory Notes, and that the funds had constituted Ambrose's only savings. Depending on the source of those funds and how Ambrose acquired same, Ambrose's creditors may have also had an interest in or a claim to those funds, since Ambrose's bankruptcy proceeding was still pending at the time.

He would have learned that Ambrose was the mother of Rosales and that Rosales had paid no monetary consideration to acquire the interest in the Shepherd Promissory Notes. He would have learned that the transfer from Ambrose to Rosales was orchestrated by Kinsley and Coghan to conceal from the Bankruptcy Court the improper incurring of debt in the acquisition of an interest in the Shepherd Promissory Notes by Ambrose. Since Ambrose's interest in the Notes was subject to avoidance, the interest of Rosales, a subsequent transferee who paid no monetary consideration and who had notice of his mother's bankruptcy proceedings, was also subject to avoidance.

He would have learned that Coghan had improperly received the sum of $10,000 from the Solls' bankruptcy estates in July, 1992.[25] He should have questioned why Kinsley removed cash from his desk drawer to pay Conter a retainer to represent, first, Ambrose and then Rosales. The evidence reflects that Conter improperly received funds from the Solls' bankruptcy estates as his cash retainer.

He would have learned that Kinsley and Coghan were representing the interests of the Solls, Ambrose and Rosales and that there was an obvious actual conflict of interest amongst these various parties. Kinsley was also acting beyond the scope of the Powers of Attorney that he had received from Ambrose and Rosales by proceeding with the takeover of the Bar. Conter could not represent the interests of Ambrose and Rosales and could not go beyond the scope of the authority provided to Kinsley in the Powers of Attorney. Yet Conter never discussed representing both Ambrose and Rosales with either individual. Conter never withdrew from his representation of Ambrose and Ro-

sales until well after the harm had been done. Conter never consulted with Rosales about the takeover of a Bar and the attendant liability that might result to Rosales.

Conter set in motion the events that led to the takeover of the Bar. He provided the correspondence to the Solls and to Little Pat which permitted Kinsley and Coghan to seize control of the Bar and start skimming the cash from the Bar. Conter's actions were to the detriment of the Solls, the Solls' bankruptcy estates, Shepherd, Little Pat, and ultimately his clients, Ambrose and Rosales.

Perhaps most telling, at the trial, Conter still did not understand what was improper about his actions, his legal advice or lack thereof, or his representation of Ambrose and Rosales.

### ISSUES

I. *Should Sanctions, as Requested by the Trustee, be Imposed Pursuant to 11 U.S.C. § 362(h).*

 A. Who has Standing to Bring an Action for Violation of the Automatic Stay.

 B. What Constitutes a Violation of the Automatic Stay.

II. *Should Sanctions, as Requested by Little Pat, be Imposed Pursuant to 11 U.S.C. § 105.*

III. *Should Sanctions as Requested by Little Pat be Imposed Pursuant to Bankruptcy Rule 9011.*

 A. General Discussion of RBP 9011.

 B. Application to the Facts.

IV. *What Amount of Damages, if any, should be Awarded to the Trustee and/or Little Pat.*

 A. Damages under 11 U.S.C. § 362(h).

 B. Damages under 11 U.S.C. § 105.

 C. Joint and Several Liability.

V. *Ethical Violations.*

 A. Scope of Representation.

 B. Communication with the Client.

 C. Competence.

---

25. See Plaintiff's Exhibit No. 21. Coghan had no Court authority to take the sum of $10,000.

D. Meritorious Claims and Contentions.

## ANALYSIS

**Issue I** *Should Sanctions, as Requested by the Trustee, be Imposed Pursuant to 11 U.S.C. § 362(h).*

### A. Who has Standing to Bring an Action for Violation of the Automatic Stay.

■ The Ninth Circuit has held that Section 362 is for the benefit of the debtor or the trustee. *In re Pecan Groves of Arizona*, 951 F.2d 242, 245 (9th Cir.1991). Thus, when the trustee fails to pursue enforcement of the automatic stay, no other party, including creditors, may challenge conduct or acts which violate the automatic stay. *Id.*

Section 362(h) states:

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

■ The Ninth Circuit Bankruptcy Appellate Panel (hereinafter "BAP") recently addressed whether a literal reading of Section 362(h) prohibited a trustee from pursuing violations of the stay. In the decision of *In re Pace*, 159 B.R. 890, 903–04 (9th Cir. BAP 1993), the BAP concluded that the trustee of the estate was an "individual" in the context of Section 362(h). *Id.* at 903. The BAP was not willing to draw a distinction between an "individual in his [sic] individual capacity, or an individual acting on behalf of the estate." *Id.* at 904. Thus, the trustee is the proper party to prosecute this action against Conter under Section 362(h).

■ The Court must also determine if Little Pat is able to seek sanctions pursuant to Section 362. Pursuant to *Pecan Groves*, Little Pat is not the debtor or a trustee and must be precluded from seeking relief under Section 362(h). In addition, Little Pat is a corporation. Thus, under a literal reading of Section 362(h), Little Pat would not be able to recover any damages.[26] This Court believes those cases which prohibit a corporation from recovering under Section 362(h) are correctly reasoned.[27]

### B. What Constitutes a Violation of the Automatic Stay.

■ For purposes of § 362(h):

A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

26. The Bankruptcy Code does not define the term "individual", thus causing the split of authority as to whether § 362(h) applies to corporations. Those cases which have prohibited a recovery to corporations are *In re Chateaugay Corp.*, 920 F.2d 183 (2nd Cir.1990); *In re Calstar, Inc.*, 159 B.R. 247, 259 (Bankr.D.Minn.1993); *In re Williams*, 124 B.R. 311, 317 (Bankr.C.D.Cal. 1991); *In re MCEG Productions, Inc.*, 133 B.R. 232 (Bankr.C.D.Cal.1991); *In re First Republic-Bank Corp.*, 113 B.R. 277, 279 (Bankr.N.D.Tex. 1989); and *In re Brilliant Glass, Inc.*, 99 B.R. 16 (Bankr.C.D.Cal.1988).

Some courts, however, have allowed a corporation to recover damages under § 362(h). *See In re Atlantic Business and Community Corp.*, 901 F.2d 325 (3d Cir.1990); *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir.1986).

The split of authority apparently devolves from whether a court is applying a literal reading of Section 362. For instance, the term "persons" is defined as "individuals, partnerships and corporations." 11 U.S.C. § 101(41). If Section 362(h) were to apply to corporations, Congress would have inserted the defined term "persons" or utilized the term "corporations." Clearly Congress did not so act. *Chateaugay Corp.*, 920 F.2d at 184. Moreover, as to other Sections of the Bankruptcy Code, when the term "individual" has been utilized it has applied only to individuals, not entities. *Id.* Those courts which have used an expansive definition for the term "individual" so as to include corporations have done so because to do otherwise would carve out Section 362(h) as a unique subsection and have it read out of context with the rest of Section 362. *Better Homes*, 804 F.2d at 292.

27. See *supra*, note 26.

*In re Bloom,* 875 F.2d 224, 227 (9th Cir. 1989).

In the decision of *In re Pace,* the BAP stated that even if a party acts in good faith or believes that the conduct is justified, the party may still be found to have violated the automatic stay. *Pace,* 159 B.R. 890 (9th Cir. BAP 1993). The *Pace* court quoted the lower court in *In re Cinematronics, Inc.,* 111 B.R. 892 (Bankr.S.D.Cal.1990), stating that where "the automatic stay is concerned, it is far better to be a 'timid soul' who seeks a court determination of the limits of the stay, rather than to fail 'while daring greatly'". *Pace,* 159 B.R. at 901 (quoting *Cinematronics,* 111 B.R. at 900).

As to whether a creditor may violate the automatic stay concerning actions of a debtor to transfer bankruptcy estate property to the creditor without prior court approval, this Court has reviewed *In re Fugazy Exp. Inc.,* 982 F.2d 769 (2nd Cir.1992). In that decision, the debtor transferred the broadcasting license to a third party postpetition and without approval of the bankruptcy court. *Id.* at 772. The *Fugazy* court noted that none of the parties filed a motion for relief from stay; the parties failed to inform the court of the postpetition transfer of the broadcasting license; and the court only learned of the transfer, because the trustee was attempting to sell the license. *Id.* The Second Circuit concluded that parties may not, through an agent or self-help, take over property of the estate. *Id.* at 776. *See also, In re Computer Communications, Inc.,* 824 F.2d 725, 729–31 (9th Cir.1987) (holding that a creditor cannot unilaterally terminate an agreement entered into with the debtor without filing for relief from the automatic stay; such "self-help and post hoc justification would defeat the purpose of the automatic stay").

At the deposition of Conter, he stated that around July 20, 1992, he met several times with Charles Kinsley and Richard Coghan.[28] At the meeting, the parties mentioned and/or discussed the Solls' bankruptcy proceedings, the transaction between Shepherd and Little Pat, the sale of the Bar to the Solls and the Solls wraparound note, and the fact that there was a pending state court lawsuit.

■ Conter asserted at trial that he took over the Bar with the consent of the Solls or their counsel.[29] Mr. Conter testified at trial that upon such consent, he felt a creditor should be able to step in and take over property of the estate and let the court know later.[30] Mr. Conter further testified that there was no violation of the automatic stay, since the Solls removed themselves from the Bar—handed over the keys—when requested.[31] Essentially, Mr. Conter argued that self-help to take over the property of the bankruptcy estate was not a violation of the automatic stay. This Court disagrees with such an analysis.

■ The Ninth Circuit has stated that *any act* in violation of the automatic stay is void. *In re Schwartz,* 954 F.2d 569 (9th Cir.1992). The automatic stay protects not only debtors, but also property of the estate. See 11 U.S.C. § 362(a)(2), (3) and (4).[32] The automatic stay remains in place as to bankruptcy estate property until the stay is vacated pursuant to 11 U.S.C. § 362(c)(1).[33] A debtor's vacating the premises is not an abandonment so as to remove the property from the bankruptcy estate. In the Ninth Circuit, abandonment requires, at a minimum, notice to all creditors and interested

---

**28.** See Deposition, p. 20, line 13 through p. 21, line 3; p. 24, line 9 through p. 25, line 13. Conter clarified that there were two meetings between July 20 and July 30, 1992. The first meeting was a general discussion, whereas the second meeting was a more detailed discussion.

**29.** See Joint Pretrial Order, Docket Entry No. 119, p. 5, lines 19–21. Mr. Conter also so testified at trial.

**30.** See trial transcript dated December 9, 1993, p. 43, lines 6–21.

**31.** See *supra,* note 29.

**32.** For instance, Section 362(a)(4) prohibits any action "to exercise control over property of the estate."

**33.** 11 U.S.C. § 362(c)(1) provides:

(c) Except as provided in subsections (d), (e), and (f) of this section—
(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate[.]

parties and an opportunity for a hearing. *In re Reed*, 940 F.2d 1317 (9th Cir.1991); *In re Alsberg*, 161 B.R. 680 (9th Cir. BAP 1993). Therefore, Conter clearly violated the automatic stay in his actions in taking over the Bar. *See also, In re Fugazy Exp. Inc.*, 982 F.2d 769 (2nd Cir.1992).

Conter, an attorney admitted to practice in Arizona, was clearly aware that the Solls had filed bankruptcy petitions. Conter did not bother to investigate fully the pleadings filed in the Solls' bankruptcy proceedings. Conter proceeded without obtaining all of the facts regarding the various transactions involving the Shepherd Promissory Notes and the transactions involving the Bar. Prior to the takeover of the Bar, Conter did not file any type of motion for relief from the automatic stay, or motion for abandonment. Furthermore, the Solls did not request that the Bar be abandoned as property of the bankruptcy estate.

Based upon the foregoing, Conter willfully violated the automatic stay pursuant to Section 362(h) as to property of the bankruptcy estate.

*II. Should Sanctions as Requested by Little Pat be Imposed Pursuant to 11 U.S.C. § 105.*

■ Although damages may not be obtainable by Little Pat under Section 362(h), corporate entities are provided with a remedy through the imposition of sanctions for the violation of the stay under Section 105 [34] of the Bankruptcy Code, RBP 9020,[35] or by certifying the party in contempt of court. See *In re Sequoia Auto Brokers*, 827 F.2d 1281 (9th Cir.1987); *In re Abacus Broadcasting Corp.*, 150 B.R. 925, 928 (Bankr.W.D.Tex. 1993) (stating that "Congress did not intend to enact a toothless statute;" thus, the corporate debtor which is harassed by a creditor despite the stay has a remedy under the civil contempt powers bestowed upon the courts under Section 105); *In re Stockbridge Funding Corp.*, 145 B.R. 797 (Bankr.S.D.N.Y.1992) *aff'd in part, vacated in part*, 158 B.R. 914, 919 (S.D.N.Y.1993) (vacating the bankruptcy

---

**34.** Section 105 of the Bankruptcy Code provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

(b) Notwithstanding subsection (a) of this section, a court may not appoint a receiver in a case under this title.

(c) The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 from its operation.

**35.** RBP 9020 provides:

(a) **Contempt Committed in Presence of Bankruptcy Judge.** Contempt committed in the presence of a bankruptcy judge may be determined summarily by a bankruptcy judge. The order of contempt shall recite the facts and shall be signed by the bankruptcy judge and entered of record.

(b) **Other Contempt.** Contempt committed in a case or proceeding pending before a bankruptcy judge, except when determined as provided in subdivision (a) of this rule, may be determined by the bankruptcy judge only after a hearing on notice. The notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense. The notice may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose. If the contempt charged involves disrespect to or criticism of a bankruptcy judge, that judge is disqualified from presiding at the hearing except with the consent of the person charged.

(c) **Service and Effective Date of Order; Review.** The clerk shall serve forthwith a copy of the order of contempt on the entity named therein. The order shall be effective 10 days after service of the order and shall have the same force and effect as an order of contempt entered by the district court unless, within the 10 day period, the entity named therein serves and files objections prepared in the manner provided in Rule 9033(b). If timely objections are filed, the order shall be reviewed as provided in Rule 9033.

(d) **Right to Jury Trial.** Nothing in this rule shall be construed to impair the right to jury trial whenever it otherwise exists.

court's finding of contempt); *In re Georgia Scale Co.*, 134 B.R. 69 (Bankr.S.D.Ga.1991) (stating that the reading of Section 362(h) did not need to be expanded to include corporations since a corporate debtor's remedy for violations of the stay is through the court's power of civil contempt); *In re First RepublicBank Corp.*, 113 B.R. at 277, 279 (Bankr. N.D.Tex.1989); *In re Brilliant Glass, Inc.*, 99 B.R. 16 (Bankr.C.D.Cal.1988).

In the decision of *In re Brilliant Glass, Inc.*, 99 B.R. 16 (Bankr.C.D.Cal.1988), the court determined that Streamline Shipper's Association (hereinafter "Streamline"), a creditor of the debtor, was aware of the stay. *Id.* at 18. Despite Streamline's awareness of the stay, it "willfully pressured the debtor's customers for payment." *Id.* Such acts were in violation of the stay. *Id.* The *Brilliant* court stated that contempt was an appropriate remedy, except that the decision of *In re Sequoia Auto Brokers*, 827 F.2d 1281 (9th Cir.1987), stated that the bankruptcy court lacked the subject matter jurisdiction to impose directly the civil contempt sanctions. *Brilliant*, 99 B.R. at 19. However, the bankruptcy court could certify the party in contempt to the district court. *Id.*

In the decision of *In re Goodman*, 991 F.2d 613 (9th Cir.1993), the court stated that the creditor Johnston Environmental Corp. could not recover damages under Section 362(h). *Id.* at 620. The *Goodman* Court then considered whether the creditor corporation had the ability to recover damages for violation of the automatic stay under the civil contempt power of the court. The Ninth Circuit adopted the reasoning of *In re Chateaugay Corp.*[36] The *Goodman* Court then stated that the difference between the award

under Section 362(h) and a civil contempt award is that under the former, the injured party "shall recover", whereas under the latter, the court's award is discretionary. *Id.*

The BAP relied on Section 105 in permitting sanctions to be assessed in the decision of *In re Pace*, 159 B.R. 890 (9th Cir. BAP 1993). The BAP noted that prior to the Ninth Circuit decision of *Sequoia Auto Brokers*, there was no need to distinguish between the term "contempt," and "sanctions." *Id.* at 904. The *Pace* Court noted that when the automatic stay is violated, there is no violation of a court order, but rather a violation of a "legislative mandate." This violation of a legislative mandate is not punishable by contempt, but is still sanctionable conduct. *Id.*

■ As discussed previously, this Court has determined that Conter was aware of the automatic stay, the appropriate procedures were not followed by Conter to obtain possession of the bankruptcy estate property, and Conter's self-help theory was insufficient to justify the willful violation of the automatic stay. Under the BAP decision of *In re Pace, supra*, this Court shall impose sanctions under Section 105 for willful violations of the automatic stay as to the harm caused by Conter to Little Pat, a corporation.

**III.** *Should Sanctions as Requested by Little Pat be Imposed Pursuant to Bankruptcy Rule 9011.*

**A. General Discussion of RBP 9011.**[37]

■ Under former *Fed.R.Civ.P.* 11, there were two primary purposes to the

---

**36.** *In re Chateaugay Corp.*, 920 F.2d 183 (4th Cir.1990).

**37.** RBP 9011 states:
(a) **Signature.** Every petition, pleading, motion and other paper served or filed in a case under the Code on behalf of a party represented by an attorney, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name, whose office address and telephone number shall be stated. A party who is not represented by an attorney shall sign all papers and state the party's address and telephone number. The signature of an attorney or a party constitutes a certificate

that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case. If a document is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the person whose signature is required. If a document is signed in violation of this rule, the court on motion or on its

Rule: (i) to deal with frivolous filings, and (ii) to deal with the misuse of judicial procedures as a vehicle for personal or economic harassment. *See Zaldivar v. City of Los Angeles*, 780 F.2d 823 (9th Cir., 1986). The first prong was based on an objective test. *Id.* at 829. The test was whether " '. . . sanctions [should] be assessed if the paper filed . . . and signed by an attorney or an unrepresented party [was] frivolous, legally unreasonable or without factual foundation, even though the paper was not filed in subjective bad faith.' " *Id.* at 831. *Accord, Hewitt v. City of Stanton*, 798 F.2d 1230, 1233 (9th Cir.1986) (stating that "a competent attorney admitted to practice before the district court" had a duty to know about contrary authority and might not rely on a good faith lack of knowledge).

■■■ The second prong of the test, also to be determined by an objective standard, focused on whether the pleading, although "well ground in fact and . . . law," was filed for an improper purpose. *Zaldivar*, 780 F.2d at 831.

Former *Fed.R.Civ.P.* 11 and RBP 9011 have been interpreted by the Ninth Circuit in *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir.1990), and *In re Marsch*, 36 F.3d 825 (9th Cir.1994). These interpretations differ.

### 1. Townsend v. Holman Consulting Corp.

In the *Townsend* decision, Patrick Townsend sued the employee benefit plan of his employer for payment of certain medical benefits. *Id.* at 1361. Townsend listed numerous defendants including Wilson & Reitman (hereinafter "Wilson"), a law partnership. Wilson moved for dismissal of the complaint as to it and requested Rule 11

sanctions. The motion to dismiss included two affidavits which reflected that Wilson had no role "in the adoption, implementation or administration of the [Employee Benefit] Plan." Townsend did not offer rebuttal evidence and subsequently filed an amended complaint. *Id.*

The court dismissed the complaint as to Wilson, gave Townsend leave to file a second amended complaint except as against Wilson, and imposed sanctions based upon the factual findings that Townsend's counsel failed to do a reasonable investigation, that the pleading was filed without an adequate basis in law or fact, and that the pleading was filed with an improper purpose of harassment. Townsend's counsel filed a motion for reconsideration, and counsel was assessed additional sanctions on the grounds that the motion for reconsideration was frivolous. The Court of Appeals reversed both awards of sanctions and then granted a rehearing. *Id.*

In its decision, the Ninth Circuit stated that although the frivolous filings and improper purpose prongs were separate and distinct, they did tend to overlap. The Ninth Circuit then stated that before sanctions could be imposed for a pleading that was filed for an improper purpose, the trial court must also determine that the pleading was frivolous. *Id.* The Ninth Circuit blended its analysis under the two separate prongs of Rule 11.

### 2. In re Marsch

The Ninth Circuit decision of *In re Marsch*, 36 F.3d 825, 829 (9th Cir.1994) distinguished between the two prongs of RBP 9011 and concluded that either prong might be a basis for sanctions. *Id.* The first prong was that the signer certified that the plead-

own initiative, shall impose on the person who *signed it, the represented party, or both*, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

**(b) Verification.** Except as otherwise specifically provided by these rules, papers filed in a case under the Code need not be verified. Whenever verification is required by these rules, an unsworn declaration as provided in

28 USC § 1746 satisfies the requirement of verification.

**(c) Copies of Signed or Verified Papers.** When these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original.

*Fed.R.Civ.P.* 11 has recently been amended. However, because RBP 9011 remains unchanged, the Court may rely on cases previously decided under the former version of *Fed.R.Civ.P.* 11.

ing was not frivolous, and the second prong was that the signer ensured that the pleading/paper was not filed for an improper purpose. *Id.* The *Marsch* court further noted that in the bankruptcy context,

we accept Townsend's basic teaching, which is that frivolousness and improper purpose are not wholly independent considerations but "will often overlap." [cite omitted] We thus adopt an interpretation of Bankruptcy Rule 9011 that differs somewhat from Townsend's interpretation of FRCP 11, but one we believe is more faithful to Rule 9011's language and more consistent with the realities of bankruptcy practice. We conclude that bankruptcy courts must consider both frivolousness and improper purpose on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other.

*Id.* at 830. The *Marsch* court determined that the debtor filed a bankruptcy petition for reasons which were not wholly frivolous, but were of dubious legal merit. *Id.* The *Marsch* court concluded that the petition was filed to delay collection of a judgment and to avoid the posting of the appeal bond and that this combined with a "flimsy legal basis" for the filing of the petition created a "robust" showing of improper purpose. *Id.* at 831. Thus, RBP 9011 sanctions were appropriate. *Id.* The *Marsch* court then determined that the award of "attorney's fees and costs incurred by the appellant in fighting the petition" were the appropriate amount of sanctions. *Id.*

█ This Court further notes that if RBP 9011 is violated, sanctions must be imposed. *Asher v. Film Ventures Int'l Inc.*, 89 B.R. 80, 86 (9th Cir. BAP 1988). However, the court has discretion as to the amount and nature of the sanctions. *In re Whitney Place Partners*, 123 B.R. 117, 123 (Bankr.N.D.Ga.1991), *aff'd, McGlamry v. Whitney Apts.*, 966 F.2d 681 (11th Cir.1992), supp. by *In re Whitney Place Partners*, 147 B.R. 619 (Bankr.N.D.Ga. 1992).

## B. Application to the Facts.

█ Here, Conter was aware that the Solls were in bankruptcy. In addition, Conter was aware that the Solls controlled and operated the Bar. However, Conter never filed any type of motion for abandonment or motion for relief from the stay prior to taking over the Bar and provided no prior notification to the secured creditor, Little Pat, that his client intended to use the cash collateral of the Bar. Conter, however, did send a series of correspondence to Little Pat regarding the acceleration of the Shepherd Promissory Notes for the benefit of his client and the intent to liquidate the necessary assets to satisfy the claims. Within the context of RBP 9011, this correspondence may be construed as "other paper served ... in a case under the Code on behalf of a party represented by an attorney...."

Conter did have telephone contact on August 4, 1992 with Little Pat's counsel as to sequestration of cash collateral and did receive a copy of at least one cash collateral order entered in one of the Solls' bankruptcy proceedings on August 18, 1992. This contact and order would have indicated that a secured creditor had an interest in the operations of the Bar and how the cash of the Bar was being expended. The docket and files also reflect that on August 19, 1992, Little Pat filed a motion for Order to Show Cause regarding the improper transfer of estate assets to Conter's client. Conter did not file any pleading with this Court on behalf of his then client, Rosales, until August 27, 1992. Conter filed the following motions and pleadings on that date: (i) a motion for relief from stay as to the equipment of the Bar; (ii) notice of motion for relief from stay; (iii) response to the motion for order to show cause filed by Little Pat; (iv) motion to modify order prohibiting use of cash collateral and order to sequester cash collateral; and (v) notice of appearance and request for service by Conter for Rosales. These pleadings were all signed by Conter. If the Court reviews the prior correspondence forwarded by Conter to Little Pat and these pleadings, the Court concludes that initially the correspondence was frivolous. Neither Ambrose nor Rosales had any real interest in the Shepherd Promissory Notes for the reasons previously outlined by this Court. Conter did not have the authority to take the actions

that he did on behalf of Ambrose or Rosales. Coghan and Kinsley had a clear conflict of interest, yet Conter assisted Coghan and Kinsley in getting control of a cash operation under color of law. Moreover, Conter then waited almost two weeks after the takeover of the Bar to file any pleadings with the Court. The pleadings that were filed were of dubious factual and legal merit.

The Court concludes that Conter did not have an "evil heart" when he prepared the correspondence and the pleadings that were filed with the Court. However, Conter must be held accountable for his lack of investigation in the matter and the correspondence and pleadings of dubious factual and legal merit. Moreover, Conter should have provided notice to all creditors and interested parties and sought Court approval prior to taking over the Bar. As the Court noted during the trial, the Court could have set an accelerated hearing and limited the time for notice to creditors to accommodate any emergency. In addition, Conter should have researched the Solls' bankruptcy files to discover whether there were any restrictions on the use of cash collateral of the Bar or other orders affecting the Bar and its assets. Instead, Conter relied solely on second hand, incomplete information.

■ This Court concludes that the evidence is compelling that the correspondence and the pleadings prepared by Conter were not well grounded in fact or law after a thorough investigation by Conter had been conducted. Therefore, Conter violated the first prong of RBP 9011. Because of the compelling evidence reflecting a violation of the first prong of RBP 9011, it is not necessary that the parties show a similar compelling violation of the improper purpose or second prong of RBP 9011. However, given the delay of Conter in filing the pleadings with the Bankruptcy Court and the failure of those pleadings to address adequately the factual and legal issues resulting from Rosales' takeover of the Bar, this Court questions whether the pleadings were filed for an

appropriate or proper purpose. In any event, the test enunciated in *In re Marsch*, *supra*, has been met.

**IV.** *What amount of damages, if any, should be awarded to the Trustee and/or Little Pat.*

**A. Damages Under 11 U.S.C. § 362(h).**

■ When the automatic stay has been violated, attorney's fees and costs may be awarded as damages. *In re Bloom*, 875 F.2d 224 (9th Cir.1989); *In re Pace*, 159 B.R. 890 (9th Cir. BAP 1993).

Here the trustee has requested a variety of damages. These include: (i) attorney's fees and costs; (ii) clean-up costs/damages; (iii) cost of the items which were missing from the roof of the premises; and (iv) emotional distress damages for Gloria Soll. The emotional distress damages were not pursued by the Trustee at the time of trial.

■ The Trustee initially requested attorney's fees and costs in the amount of $76,732.47.[38] However, on May 24, 1994, counsel for the Trustee filed a Supplemental Breakdown of attorney's fees and costs. The sum of $76,732.47 was allocated as follows: $26,793 in attorney's fees pertaining to the prosecution of this adversary action; $3,399 in fees relating to the turnover proceeding; and $43,727 in fees and $2,814 in expenses pertaining to the general administration of the Solls' cases.[39]

On May 26, 1994, counsel filed a Second Supplemental Breakdown of attorney's fees and costs. In this pleading, Trustee's counsel states that the sum of $43,446 in attorney's fees is due and owing pertaining to the prosecution of this adversary action; the sum of $3,399 in fees is due and owing relating to the turnover proceeding; and the sum of $53,985 in fees and the sum of $4,220 in expenses are due and owing pertaining to the general administration of the Solls' cases.[40]

This Court has determined that the attorney's fees and costs requested by the Trust-

---

**38.** See Plaintiff's Exhibit No. 29.

**39.** *See Docket Entry No. 140, Plaintiff's Exhibit No. 29B.*

**40.** See Docket Entry No. 141, Plaintiff's Exhibit No. 29C.

ee's counsel as to all matters but the general administration of the Solls' cases are reasonable and should be paid by Conter pursuant to Section 362(h). Conter should pay the Trustee the sum of $43,446 and $3,399 or the total of $46,845.

 The Trustee also requested damages for the cost of the clean-up of the premises. The Trustee testified that the damages to the premises were recent. This evidence was not controverted. However, the Trustee could not ascribe these damages specifically to Conter. The Trustee testified that these damages included repair and/or replacement of the carpeting, repair of the plumbing, repair of the electrical wiring, changing the locks on the premises, repairing the security system, and paying for a general clean-up of the Bar. The Trustee further testified that he had to pay for certain outside services and payroll expenses which were not paid by Coghan and Kinsley when they operated the Bar.[41] Finally, given the disarray of the Bar's books and records, the Trustee had to spend a considerable amount of time reconstructing same and filing returns with the appropriate taxing authority.[42] The Trustee also testified that the satellite dish had been removed from the roof of the Bar. Obviously it is difficult to ascribe all of these damages to Conter.

Although the Trustee requests that all of the aforesaid damages be paid by Conter, it is difficult for this Court to apportion certain damages to Conter rather than to Kinsley and Coghan. In essence, this Court concludes that Kinsley and Coghan depleted the Bar of its cash, refused to pay legitimate expenses of the Bar while they were operating it, caused recent damage to the Bar's premises and security system which the Trustee needed to repair, and caused the books and records of the Bar to be in such a state of disarray that the Trustee's accountant had to try to reconstruct same. However, this Court concludes that the award of the attorney's fees and costs of the Trustee in the amount $46,845 is the amount of damages for which Conter should be held directly responsible. Conter litigated this matter over a prolonged period of time and is directly responsible for certain attorney's fees and costs of the Trustee.

 The Trustee also requested damages for the lost revenues of the Bar. The Court concludes that any request for lost revenues or profits is difficult to quantify. The Court must also consider to what extent Conter should be held directly responsible for these damages. The Court concludes that based upon the evidence presented, this Court is unable to award any damages to the Trustee for lost revenues. The evidence was too speculative. The Court also concludes that it would be an abuse of discretion to hold Conter directly responsible for any revenues which were lost during the time period that Coghan and Kinsley had possession or control of the Bar.

### B. Damages under 11 U.S.C. § 105.

 Little Pat has requested a variety of damages. These include: (i) attorney's fees and costs; (ii) damages for loss of business during the two-week period in which Rosales occupied the premises; and (iii) rental for the period in which Conter "occupied" the premises on behalf of Rosales. Plaintiff's Exhibit 28 sets forth the attorney's fees and costs incurred, which fees and costs equal the sum of $34,327.98. On May 24, 1994, Little Pat's counsel filed an amendment to Exhibit 28, highlighting in pink those entries which were directly related to the sanctions proceedings against Conter alone.[43] The Court has not run a tabulation of those entries highlighted in pink. However, the Court has reviewed all of the entries. The hourly rate is reasonable as to each highlighted entry, and the amount of time expended therein is also reasonable. Little Pat's counsel shall submit a final tabulation of these specific highlighted entries. It is this Court's intention to award those entries highlighted in pink as appropriate sanctions against Conter pursuant to 11 U.S.C. § 105.

---

41. See Plaintiff's Exhibit No. 20.

42. See Plaintiff's Exhibit No. 30.

43. See Plaintiff's Exhibit 28A.

Finally, on June 3, 1994, Little Pat's counsel filed a supplement pertaining to those attorneys' fees and costs incurred by Little Pat in May, 1994.[44] All entries and those entries marked by a dash in the margin have been reviewed by the Court. Again the hourly rate as to the marked entries is reasonable, the amount of time expended therein on a particular task is reasonable, and the entries so marked are directly related to the sanctions issue with Conter. Little Pat shall tabulate these marked entries. It is the Court's intention to award these marked entries as to attorney's fees and costs incurred in May, 1994, as additional sanctions against Conter once the Court receives the tabulation from Little Pat.

Based upon the Ninth Circuit case law, this Court has determined that the aforesaid highlighted or marked attorney's fees and costs shall be awarded to Little Pat as sanctions against Conter.

■ Little Pat has also requested damages for the loss of business during the two-week period in which Coghan and Kinsley occupied the premises. These damages were based upon the violation of the cash collateral order. The principal of Little Pat testified as to the nature and cash flow of the business and how the business decreased upon the takeover of the Bar. However, the principal of Little Pat had not conducted the business of the Bar since the sale of the Bar in October, 1991 to the Solls. The testimony of the Solls concerning the operation of the Bar was not credible. However, as noted hereinafter concerning the issue of joint and several liability, the Court must consider to what extent Conter should be responsible for all of the damages incurred by the Trustee or Little Pat. Certainly this matter was hotly contested and Conter insisted that he did nothing wrong. This Court obviously disagrees. As such, Conter should be held directly responsible for any attorney's fees and costs incurred by the Trustee or Little Pat in seeking the recovery of the Bar from Conter's client and also any attorney's fees and costs incurred in litigating the sanctions issue with Conter. However, the Solls improperly operated the Bar for a prolonged period of time, and Coghan and Kinsley acted improperly without any intervention or assistance from Conter. As such, Conter should not be responsible for all damages incurred. Little Pat was not able to support sufficiently its allegations and calculation of damages for this Court to award all of the damages requested.

■ Little Pat also argued that it should be awarded rent for the period in which Conter occupied the premises on behalf of Rosales. For the reasons stated above, this Court shall deny the additional request for damages.

## C. Joint and Several Liability.

■ This Court further notes that the Trustee and Little Pat requested that Conter be liable on the basis of joint and several liability. *Pearce v. Stone*, 149 Ariz. 567, 720 P.2d 542 (Ariz.App.1986), and *McElhanon v. Hing*, 151 Ariz. 386, 728 P.2d 256 (Ariz.App. 1985), *aff'd in part, vacated in part*, 151 Ariz. 403, 728 P.2d 273 (Ariz.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1956, 95 L.Ed.2d 529 (1987) were cited to support the parties' position that joint and several liability should apply. However, in the aforesaid cases, the party to be held liable actively participated in the fraud or was involved in the conspiracy. Based upon the evidence and the testimony presented to this Court, this Court concludes that Conter may not have acted wisely with respect to his actions and conduct regarding the Bar; however, there has been no indication that Conter participated in any fraudulent scheme against the Solls, the Trustee or Little Pat. Moreover, the parties have provided no Ninth Circuit support requiring that the concept of joint and several liability be expanded and incorporated in an award of damages under 11 U.S.C. § 362(h) or § 105.

## V. Ethical Violations

■ Rule 42 of the *Rules of the Supreme Court of Arizona*, sets forth the professional conduct of attorneys. Ethical Rules ("E.R.") 1.1, 1.2, 1.4 and 3.1 pertain to this case.

---

44. See Docket Entry No. 145.

## A. Scope of Representation.

Under E.R. 1.2,[45] counsel is limited to the client's decision regarding the objectives of the representation. Conter stated that Kinsley was acting on behalf of Ambrose and Rosales as their attorney-in-fact pursuant to the Powers of Attorney. The Powers of Attorney executed by Ambrose and Rosales were the same in scope. Kinsley only had the power to collect and take related actions to collect the Shepherd Promissory Notes which were due and payable. The Powers of Attorney did not give Kinsley the power to take possession of and run the operations of the Bar. Kinsley could not retain an attorney who had a broader scope of representation than he did. Moreover, Conter took action prior to the effective date of either the Ambrose or Rosales Power of Attorney.

Conter was aware of the extent of the Powers of Attorney and, hence, the limitation on the scope of his representation. Conter testified at his deposition, that he tried to advise Kinsley that the takeover of the Bar might not be a means to recover on the Shepherd Promissory Notes. However, Conter's actions assisted Kinsley and/or Coghan in taking control of the Bar. He subjected his client, Rosales, to increased liability without discussing the expanded nature of Conter's representations with either Kinsley or Rosales. Moreover, Conter expanded the scope of his representation into an area with which he was not familiar and did not seek appropriate advice or association of counsel. This Court concludes that Conter violated E.R. 1.2.

## B. Communication with the Client.

■ Conter also had the duty to keep the client reasonably informed as to how the matter was progressing and to explain the matter to the extent necessary for the client to make decisions. E.R. 1.4.[46] Here, Conter did not inform either Ambrose or Rosales (i) as to what efforts or strategies Conter was employing with respect to collection of the Shepherd Promissory Notes; (ii) that Kinsley and/or Coghan were going to take over the operations of the Bar; and (iii) the extent of the exposure of Rosales to potential personal liability for assuming the operation of the Bar.

Conter argued that Kinsley acted as attorney-in-fact pursuant to the Powers of Attorney and Conter had communicated with Kinsley. This argument fails in that Conter and Kinsley were acting beyond the scope of the Powers of Attorney. Furthermore, the testimony of Conter at the trial and his deposition do not reflect that Kinsley was informed of the potential liability that might be incurred in taking over the Bar or in not sequestering the cash collateral of the Bar. This Court concludes, based upon the trial testimony and the exhibits, that Conter failed to communicate with his client in order to keep the client abreast of the status of the case and to provide sufficient information to allow the client to make an informed decision.

## C. Competence.

■ Conter had the duty to make sure he could provide his client with competent rep-

45. E.R. 1.2, SCOPE OF REPRESENTATION, states in pertinent part:

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. . . .

* * * * * *

(c) A lawyer may limit the objectives of the representation if the client consents after consultation.
(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client

and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.
(d) When a lawyer knows that a client expects assistance not permitted by the Rules of Professional Conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct.

46. E.R. 1.4, COMMUNICATION, provides:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

resentation under E.R. 1.1.[47] This Court has previously discussed the numerous problems that Conter encountered in attempting to represent his client in the bankruptcy area. Conter was confronted with a variety of warning signs that he was not conducting adequate research or obtaining the assistance of bankruptcy counsel to represent the interests of his client. Despite his lack of or thorough understanding of the bankruptcy repercussions of his actions, Conter decided to advise his client to take over a Bar that was subject to the jurisdiction of the Bankruptcy Court. This Court concludes that Conter failed to have the requisite competence to represent his client in such a take-over.

### D. Meritorious Claims and Contentions.

Conter also had the duty as an advocate for his client to raise only meritorious claims and contentions under E.R. 3.1.[48] As discussed in Section III., *supra,* Conter's correspondence and pleadings, forwarded or filed as a part of this bankruptcy proceeding, were not well grounded in fact or law after a thorough investigation had been conducted. Furthermore, this Court has also concluded that Conter violated the automatic stay. This Court has concluded that a party may not rely on self-help to take over property of the bankruptcy estate. *See* Section I.B., *supra,* of the Decision. This Court concludes that Conter did not rely upon a proper extension of the law and that Conter's actions were frivolous in nature. Thus, Conter violated E.R. 3.1.

### *Conclusion*

The foregoing discussion of the facts and law convincingly sets forth that Conter should be sanctioned for his actions pursuant to 11 U.S.C. §§ 362(h) and 105. The Court has exercised its discretion and determined an appropriate award to both the Trustee and to Little Pat.

---

47. E.R. 1.1., COMPETENCE, provides:
 A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

48. E.R. 3.1., MERITORIOUS CLAIMS AND CONTENTIONS, provides:
 A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. . . .